AMERICAN MARINE CORPORATION

v.

BARGE AMERICAN GULF
III, in rem, et al.

Nos. Civ.A. 95–2701, Civ.A. 95–
2756, Civ.A. 95–2757.

United States District Court,
E.D. Louisiana.

Jan. 4, 2000.

## MEMORANDUM OPINION

MENTZ, District Judge.

The United States of America seeks to recover under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. app. § 1300, *et seq.*, for shortages and seawater damage in two shipments of wheat cargos: (1) from Houston, Texas to Matarani, Peru in September, 1992 and (2) from Destrehan, Louisiana and Galveston, Texas to Georgetown, Guyana in September, 1993.

The case was tried before the court without a jury. Having considered the evidence, the parties' memoranda, the applicable law, and for the reasons hereinafter stated, the Court rules in favor of the United States.

### FINDINGS OF FACT

1. In these consolidated proceedings, the United States seeks to enforce a maritime lien for the alleged cargo losses in the amount of $61,647.75, plus prejudgment interest and costs.

2. The United States is proceeding *in rem* against a general bond in the amount $213,000 filed as a substitute *res* for the Barges COV POSEIDON (ex Barge AMERICAN GULF III) and COV HERCULES (ex Barge AMERICAN GULF IV).

3. Candies Offshore Venture, LLC posted the security as the claimant/owner of the Barges.

4. Candies Towing Co., Inc. seeks to enforce its First Preferred Ship's Mortgage on each of the Barges. The unpaid balance on the note secured by the mortgages held by Candies Towing exceeds $5,000,000.

5. The Coast Guard received the mortgages for recordation on March 31, 1993. The parties agree that the United States' claim related to the 1992 voyage primes the liens of Candies Towing on the COV POSEIDON (ex Barge AMERICAN GULF III) and the COV HERCULES (ex Barge AMERICAN GULF IV) because the mortgages were not recorded until after the voyage.

6. The United States brought suit asserting its liens approximately three years after the 1992 voyage and two years after the 1993 voyage.

7. At issue is the liability of the Barges for the alleged cargo losses and the amount the damages related to both voyages, the lien ranking between the United States and Candies Towing with respect to the cargo losses on the September, 1993 Guyana voyage, and the United States' entitlement to prejudgment interest.

### 1992 Shipment to Matarani, Peru

8. On June 30, 1992, the United States Agency for International Development ("AID") chartered the Tug DOC CANDIES and Barges AMERICAN GULF III and AMERICAN GULF IV to carry "15,600 metric tons, minimum/maximum, of wheat from the United States to Matarani, Peru or Africa, Chile at charter's option."

9. In September, 1992, AID shipped 15,594.879 metric tons of bulk wheat from Houston, Texas to Matarani, Peru in the Barges AMERICAN GULF III and AMERICAN GULF IV, under the tow of the Tug DOC CANDIES, in consideration of prepaid freights.

10. The wheat was loaded aboard in good order and condition. The authorized agent for the defendant Barges issued a clean on board bill of lading number 9–WHEAT–2 211 038 02, dated September 23, 1992, in the amount of 15,594.879 metric tons.

11. The flotilla, consisting of the Tug DOC CANDIES and Barges AMERICAN GULF III and AMERICAN GULF IV, then sailed from Houston, Texas to Matarani, Peru. Upon opening of the hatches in Matarani, Peru, a portion of the cargo was found wetted or caked due to seawater intrusion, and a portion of the cargo was short landed.

12. The Bill of Lading and the Cargo Survey certificate issued by Marine Surveyor & Control Services EIRL[1] on November 24, 1992, show that a total of 15,-594.879 metric tons was loaded aboard the Barges, while only 15,284.45 was discharged, resulting in a total short landed quantity of 310.42 metric tons.

13. The cargo short landed is quantified in the Cargo Survey Certificate. That document reflects that all of the cargo was discharged except the damaged portions consisting of 42.8 metric tons from the AMERICAN GULF III and 113.00 metric tons from the AMERICAN GULF IV. It also shows, per the silo scale, total shortages of 196.20 metric tons of the Barge AMERICAN GULF III's cargo and 114.22 metric tons of the Barge AMERICAN GULF IV's cargo for a total shortage of 310.42 metric tons.

14. With the prepaid freight averaged across the full quantity of wheat shipped under the clean on board bill of lading at $190.19 per metric tons, the value of the cargo shortfall for the Matarani voyage is $59,040.68.

*Shipment to Georgetown, Guyana*

15. On September 1, 1993, AID chartered the Tug ADELE CANDIES and the Barge AMERICAN GULF IV to carry "6,251 metric tons, minimum/maximum, of wheat from the United States to Georgetown, Guyana."

16. The wheat cargo of 1,563 metric tons from Destrehan, Louisiana and 4,554.296 metric tons from Galveston, Texas was shipped in September, 1993 in the Barge AMERICAN GULF IV, under the tow of the Tug ADELE CANDIES, to Georgetown, Guyana, in consideration of prepaid freights.

17. The wheat was loaded aboard in good order and condition and the authorized agent of the Barge AMERICAN GULF IV issued clean on board Bills of Lading No. 49/591399 8–WHEAT–7 Destrehan–Georgetown, dated September 4, 1993, and No. 211 047 04 8–WHEAT–7 Galveston–Georgetown, dated September 21, 1993.

18. The flotilla, consisting of the Tug ADELE CANDIES and Barge AMERICAN GULF IV, then sailed from Galveston, Texas to Georgetown, Guyana. Upon the opening of the hatches, a portion of the bulk cargo was found wetted or caked, and a portion of the cargo was short landed.

19. The cargo short landed is quantified in Guyana National Shipping Corp., Ltd.'s Survey Report L93/156 dated October 29, 1993, which reflects a shortage of 13 metric tons of the Barge AMERICAN GULF IV's cargo.

20. With the prepaid freight averaged across the full quantity of wheat shipped under the clean "on board" bills of lading at $.200543 per metric tons, the value of the cargo shortfall for the Guyana voyage is $2,607.07.

*CONCLUSIONS OF LAW*

1. This court has subject matter jurisdiction over this dispute pursuant to Article III, Clause 2 of the United States Constitution and 28 U.S.C. § 1333, as an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

---

1. This court entered an order prior to trial prohibiting the United States from using the survey report prepared by Maloney Commodity Services, Inc. ("MCS"), on the ground that it did not satisfy Federal Rule of Evidence 803(8)'s requisites for admission under the public records and reports hearsay exception. *See* Rec. Doc. No. 73, Order and Reasons entered June 7, 1999. The court did not exclude the Marine Surveyor & Control Services EIRL's Cargo Survey Report as hearsay because it did not have the same trustworthiness problems as the MCS report. The court admitted the report on the United States' offer, notwithstanding the objections of Candies Offshore and Candies Towing. Later, Candies Offshore offered the same report into evidence during its case. This survey and the Bill of Lading are the only documentary evidence of the amount of damage.

2. The rights and liabilities of the parties to this action are governed by the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. app. § 1300, *et seq.* COGSA defines the rights and duties of the parties "from the time when the goods are loaded on to the time when they are discharged from the ship." 46 U.S.C. app. § 1301(e).

3. The Barges COV POSEIDON (ex Barge AMERICAN GULF III) and COV HERCULES (ex Barge AMERICAN GULF IV) are "carriers," as that term is used in COGSA, with respect to the United States' cargos. *American Home Assurance Co. v. M/V SLETTER,* 1994 AMC 2269 (E.D.La.1993), *aff'd,* 43 F.3d 995 (5th Cir.1995).

4. One of the broad obligations imposed upon the carrier by COGSA is to "properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried." 46 U.S.C.App. § 1303(2). The carrier also has a nondelegable duty to exercise due diligence to "[m]ake the holds ... and all other parts of the ship in which goods are carried, fit and safe for their reception, carriage, and preservation." 46 U.S.C. app. § 1303(1)(c); *California and Hawaiian Sugar Refining Corp. v. Winco Tankers, Inc.,* 278 F.Supp. 648, 650 (E.D.La.1968).

5. These duties are not absolute; section 1304 provides a number of exceptions to liability. If a carrier can establish one of these exceptions, it may exonerate itself from liability for loss or damage to cargo. 46 U.S.C. app. § 1304(1) and (2)(a)-(q); *Schnell v. the Vallescura,* 293 U.S. 296, 303, 55 S.Ct. 194, 195, 79 L.Ed. 373 (1934); *Tapco Nigeria, Ltd. v. M/V WESTWIND,* 702 F.2d 1252, 1259 (5th Cir.1983)(citing *the Vallescura,* 293 U.S. 296, 303, 55 S.Ct. 194, 195, 79 L.Ed. 373 (1934)).

■ 6. A prima facie case is established against a carrier by proof that the shipment was delivered to the carrier in good condition and that the carrier failed to deliver the goods in like quantity and condition at the destination. 46 U.S.C. app. § 1303(4); *Associated Metals and Minerals Corp. v. M/V RUPERT DE LARRINAGA,* 581 F.2d 100, 101 (5th Cir. 1978).

7. The United States made a prima facie case by entering into evidence the clean on board bills of lading and the survey reports quantifying the cargo damage and shortages. 46 U.S.C. app. § 1303(4); *Pacific Employers Ins. Co. v. M/V GLORIA,* 767 F.2d 229, 239 (5th Cir. 1985); *Blasser Brothers, Inc. v. Northern Pan–American Line,* 628 F.2d 376, 381 (5th Cir.1980).

■ 8. The entry of seawater into a cargo hold raises a presumption that the seawater damage resulted from the fault and privity of the carriers in their failure to exercise due diligence to make the barges seaworthy. *See Trade Arbed, Inc. v. M/V SWALLOW,* 688 F.Supp. 1095, 1106 (E.D.La.1988) (citing *Wessels v. The ASTURIAS,* 126 F.2d 999, 1001 (2nd Cir. 1942)).

9. The short delivery of cargo and the seawater damage constitute breaches of the carriers' obligations under COGSA. 46 U.S.C. app. § 1303(1) and (2).

10. It therefore becomes the carriers' burden to show that the loss or damage falls within one of the COGSA exceptions to liability set forth in 46 U.S.C. app. § 1304. *Tapco Nigeria, Ltd.,* 702 F.2d at 1259.

11. Under the exception to unseaworthiness in § 1304(1), the carrier must establish that the loss was not caused by its own lack of diligence to make the vessel seaworthy. "This heavy burden is not carried if the issue is left in doubt." *Winco Tankers,* 278 F.Supp. at 652 (quoting *Artemis Maritime Co., Inc. v. Southwestern Sugar & Molasses Co.,* 189 F.2d 488, 491 (4th Cir.1951)).

12. Under the "Q Clause" exception found in § 1304(2)(q), the carrier has the burden to show that the loss was not caused by its neglect.

13. Any doubts as to the cause of the loss must be resolved against the carrier. *M/V GLORIA,* 767 F.2d at 242.

14. The evidence shows that seawater entered the Barges' holds during the transit creating a presumption of unseaworthiness. The evidence does not establish that the seawater wetting of the cargoes in the Barges was due to something other than the Barges' unseaworthiness. The court finds that the losses due to seawater intrusion were caused by the Barges' unseaworthiness and/or negligence while the cargo was in transit. The carriers failure to refute this presumption renders the exceptions in § 1304(1) and 1304(2)(q) inapplicable to the wetted portions of the cargoes.

15. The cause of the short landed cargo remains unexplained. The evidence does not establish that the electrical problems during the discharge to the silo or any actions of the stevedores played a part in the short landed cargo. The carriers have not met the burden of proving the lack of fault or neglect that contributed to this unidentified cause of loss. Therefore, the "Q Clause" exception does not avail the carriers with regard to the short landed cargo.

16. The fact that the exact cause of the shortage is not proved does not preclude the carrier from liability. *M/V GLORIA,* 767 F.2d at 242.

17. Accordingly, the United States is entitled to judgment as a matter of law for damages in the amount of $61,647.75.

18. Congress has, at 46 U.S.C. § 31326, statutorily ranked the liens asserted against vessels. Under this statute, "preferred maritime liens" rank above "preferred ship mortgage liens." "A 'preferred maritime lien' means a maritime lien on a vessel .. for damage arising out of a maritime tort." 46 U.S.C. § 31301(5)(B). The Fifth Circuit has held that preferred maritime liens arising from cargo damages are tort liens which prime a preferred ship mortgage lien. *Associated Metals & Minerals v. ALEXANDER'S UNITY MV,* 41 F.3d 1007 (5th Cir.1995). Therefore, the United States' preferred maritime lien is superior to the preferred ship mortgage lien of Candies Towing against the COV POSEIDON (ex Barge AMERICAN GULF IV) with respect to the September, 1993 voyage to Guyana.

19. In maritime cases, "pre-judgment interest must be awarded unless unusual circumstances make an award in equitable." *Ryan Walsh Stevedoring Co. v. James Marine Services, Inc.,* 792 F.2d 489, 492–93 (5th Cir.1986).

20. A plaintiff's undue delay in prosecuting the lawsuit is an "obvious example" of a circumstance justifying the denial of interest. *City of Milwaukee v. Cement Div., Nat'l Gypsum Co.,* 515 U.S. 189, 196, 115 S.Ct. 2091, 132 L.Ed.2d 148 (1995) (quoting *General Motors Corp. v. Devex Corp.,* 461 U.S. 648, 657, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983)).

21. Since "prejudgment interest is a form of compensation, rather than a penalty . . . ," *Dow Chemical Co. v. M/V GULF SEAS,* 593 F.2d 613, 614 (5th Cir. 1979), delays in litigation not caused by the plaintiff are not such peculiar circumstances as to justify the denial of prejudgment interest. *Socony Mobil Oil Co. v. Texas Coastal & International, Inc.,* 559 F.2d 1008, 1014 (5th Cir.1977), *rehr'g denied,* 568 F.2d 1367 (5th Cir.1978).

22. The United States filed its lawsuits on its cargo claims nearly three years after the 1992 losses were discovered, and nearly two years after the 1993 losses were discovered. Under these circumstances, the court finds that exceptional circumstances warrant exercising its discretion to depart from the general rule and decline the award of prejudgment interest, at least during the period that the United States delayed in filing suit. Fairness dictates that interest should run from the date the United States filed suit to assert its maritime liens, August 23, 1995.

23. The United States is not responsible for delays in litigation caused by the bankruptcy of another party.

24. Interest shall be calculated at the Treasury rate described at 31 U.S.C. § 3717(a).

25. As a prevailing party, the United States is also awarded costs in accordance with 28 U.S.C. § 1920.

26. The United States' liens will be satisfied immediately after any administrative costs by a disbursement of funds from the $213,000 bond held by the Clerk of Court.

27. After the administrative costs and the United States' judgment with prejudgment interest and costs is compensated from the $213,000 bond, the remainder of the bond is awarded to Candies Towing Co., Inc. as compensation for its First Preferred Ship Mortgage liens.

Accordingly,

IT IS ORDERED that judgment be entered in favor of the United States and against the general bond in the amount of $61,647.75, together with prejudgment interest from August 23, 1995 and costs, the remainder of the bond to be paid to Candies Towing Inc.

### *JUDGEMENT*

IT IS ORDERED, ADJUDGED, AND DECREED that judgement is entered in favor of the United States (as plaintiff in Civil Action No. 95–2756 and No. 95–2757 and intervenor in 95–2701) and against the general bond as substitute *res* for the COV POSEIDON (ex Barge AMERICAN GULF III) and the COV HERCULES (ex Barge AMERICAN GULF IV) in the amount of $61,647.75, together with prejudgment interest at the Treasury rate described at 31 U.S.C. § 3717(a) from August 23, 1995 and costs, the reminder of the bond to be paid to Candies Towing Inc. (intervenor in Civil Action No. 95–2701).

IT IS FURTHER ORDERED, ADJUDGED and DECREED the interven-

tion of Candies Offshore Venture, LLC in Civil Action No. 95–2701 and Civil Action No. 95–2756 is **DISMISSED.**